# Exhibit 1

# Commission Opinion

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.

SECURITIES ACT OF 1933
Rel. No. 9553 / February 27, 2014

SECURITIES EXCHANGE ACT OF 1934
Rel. No. 71632 / February 27, 2014

Admin. Proc. File No. 3-13871

---

In the Matter of

RONALD S. BLOOMFIELD,
ROBERT GORGIA, and
JOHN EARL MARTIN, SR.

---

OPINION OF THE COMMISSION

BROKER-DEALER PROCEEDING

CEASE-AND-DESIST PROCEEDING

**Grounds for Remedial Action**

**Unregistered Offer and Sale of Securities**

**Failure to Supervise**

**Aiding and Abetting and Causing Reporting Violations**

Registered representatives of broker-dealer engaged in unregistered sales of securities without an exemption from registration. Senior manager failed reasonably to supervise registered representatives with a view towards detecting and preventing their registration violations. Registered representatives and senior manager aided and abetted and were a cause of broker-dealer's failure to file suspicious activity reports. *Held*, it is in the public interest to: bar registered representatives from association with any broker or dealer and from participation in any penny stock offerings; bar senior manager from association with any broker or dealer with a right to reapply in a non-proprietary, non-supervisory capacity after two years; require registered representatives to disgorge their ill-gotten gains and pay prejudgment interest; and impose cease-and-desist orders and civil money penalties against all respondents.

APPEARANCES:

*Robert B. Martin*, *Jr.*, for Ronald S. Bloomfield and John Earl Martin, Sr.

*Robert Gorgia*, *pro se.*

*David Stoelting* and *Adam Grace*, for the Division of Enforcement.

Appeal filed: May 5, 2011
Last brief received: August 26, 2011

TABLE OF CONTENTS

I.      Penny stocks present risks of trading abuses

II.     Bloomfield and Martin established a penny stock business at Leeb
        A.      Many Bloomfield and Martin accounts presented indicia of illegal, unregistered
                securities transactions, market manipulation, money laundering, and
                tax evasion, and Bloomfield and Martin failed to do anything in response
        B.      Bloomfield and Martin received multiple warnings about the possibility of illegal
                activity in customer accounts and failed to do anything in response
        C.      Bloomfield and Martin failed to conduct a reasonable
                inquiry into the source of their customers' stocks

III.    Bloomfield and Martin violated registration requirements

IV.     Gorgia failed to discharge his supervisory responsibilities
        A.      Gorgia supervised Bloomfield and Martin
        B.      Gorgia failed reasonably to supervise Bloomfield and Martin
        C.      Gorgia did not qualify for Exchange Act Section 15(b)(4)(E)'s "safe harbor"

V.      Bloomfield, Martin, and Gorgia aided and abetted and were a cause of Leeb's reporting
        violations
        A.      Broker-dealers must report certain suspicious transactions to the U.S. Treasury
                Department's Financial Crimes Enforcement Network
        B.      Leeb violated Exchange Act Section 17(a) and Exchange Act Rule 17a-8 by failing
                to file SARs
        C.      Bloomfield, Martin, and Gorgia aided and abetted Leeb's SARs violations

VI.     Bloomfield's, Martin's, and Gorgia's conduct warrants significant sanctions
        A.      Bars
        B.      Cease-and-Desist Orders
        C.      Disgorgement
        D.      Civil Money Penalties

1

Ronald S. Bloomfield, John Earl Martin, Sr., and Robert Gorgia appeal from an administrative law judge's decision.[1] Bloomfield and Martin were registered representatives at Leeb Brokerage Services, Inc., a former registered broker-dealer[2] and NASD[3] member with its main office in New York City (the "New York office") and an Office of Supervisory Jurisdiction (the "OSJ")[4] in Santa Monica, California. Gorgia was Leeb's Chief Financial Officer ("CFO") with supervisory authority over Bloomfield and Martin. The law judge found that from early 2005 to mid-2007 (the "relevant period"), Bloomfield and Martin willfully violated Sections 5(a) and 5(c) of the Securities Act of 1933[5] by selling large amounts of low-priced ($5 or less), highly-speculative securities known as "penny stocks"[6] to the public when no registration statement was filed or in effect as to those securities and no exemption from registration was available. The law judge found that Gorgia violated Sections 15(b)(4) and 15(b)(6) of the Securities Exchange Act of 1934[7] by failing reasonably to supervise Bloomfield, Martin, and a third registered representative, Victor Labi,[8] with a view towards detecting and preventing their Securities Act Section 5 violations. The law judge also found that Bloomfield, Martin, and Gorgia willfully aided and abetted and were a cause of Leeb's failure to file suspicious activity reports ("SARs"), in violation of Exchange Act Section 17(a) and Exchange Act Rule 17a-8.[9]

---

[1] *Ronald S. Bloomfield*, Initial Decision Rel. No. 416-A, 2011 WL 1591553 (Apr. 26, 2011).

[2] Leeb was registered with the Commission from 1999 until mid-2007 when the firm withdrew its registration and ceased doing business.

[3] This case was instituted after the creation of The Financial Industry Regulatory Authority, Inc. in July 2007, but the conduct at issue took place before that date. Where appropriate, this opinion refers to the entity as NASD, rather than as FINRA.

[4] An OSJ is an office of an NASD member at which certain specified functions, such as order execution and market making, take place. *See* NASD Rule 3010(g)(1) (defining the term "Office of Supervisory Jurisdiction").

[5] 15 U.S.C. §§ 77e(a), 77e(c).

[6] *See* 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51-1 (defining the term "penny stock").

[7] 15 U.S.C. §§ 78o(b)(4), 78o(b)(6).

[8] The law judge found that Labi willfully violated Securities Act Sections 5(a) and 5(c) and willfully aided and abetted and was a cause of Leeb's violations of Exchange Act Section 17(a) and Exchange Act Rule 17a-8. The law judge issued a cease-and-desist order against Labi, barred him from association with any broker or dealer and from participation in any penny stock offering, assessed a $100,000 third-tier civil money penalty, and ordered him to disgorge $152,483, plus prejudgment interest. Labi did not appeal the law judge's decision, which became final as to him. *Victor Labi*, Exchange Act Rel. No. 64698, 2011 WL 2433273 (June 17, 2011).

[9] 15 U.S.C. § 78q(a); 17 C.F.R. § 240.17a-8.

2

The law judge issued cease-and-desist orders against Bloomfield, Martin, and Gorgia, barred them from association with any broker or dealer and from participation in any penny stock offering, assessed third-tier civil money penalties of $100,000 each, and ordered Bloomfield and Martin to pay $272,342 and $964,969, respectively, in disgorgement, plus prejudgment interest. We base our findings on an independent review of the record, except with respect to those findings not challenged on appeal.

## I.   Penny stocks present risks of trading abuses.

Penny stocks present risks of trading abuses due to the lack of publicly available information about the penny stock market in general and the price and trading volume of particular penny stocks.[10] Investors who lack access to this type of information are less able to make informed investment decisions and thus are more susceptible to the manipulative sales practices of unscrupulous individuals. Because of these risks of abuses, broker-dealers need to be alert for suggestions of problems and irregularities regarding their customers' transactions in penny stocks. For example, an obscure issuer and a thinly traded security, combined with the deposit of stock certificates in a large volume of shares or the sale of those stocks for an account holder who is a known stock promoter, can indicate that the transaction is part of an unlawful distribution.

Penny stocks can also be used in connection with fraudulent and manipulative schemes. When one person or a small group of persons controls a stock, those persons can have a greater ability to manipulate the stock's price than when the stock is widely held. In a "pump-and-dump" scheme, the price of a stock is manipulated upward, typically by stock promoters, investor relations firms, and/or broker-dealers who make undisclosed deals with a company to recommend its stock, provide false or misleading information about the company, and enter trades into the market designed to create the illusion of market demand and induce others to buy the stock. These undisclosed deals often include cash and the issuance of the company's stock to promoters[11] and investor relations firms who acquire the stock directly from the company or its insiders, *i.e.*, past and present officers or directors, at nominal prices in private transactions known as PIPEs (private investments in public equity).[12] Participants in the scheme make substantial profits when they sell their stock to the public at the artificially inflated prices. Once the scheme is over, the stock's price

---

[10]   *See generally Microcap Stock: A Guide for Investors*, http://www.sec.gov/investor/pubs/microcapstock.htm.

[11]   For such stock promoters, an additional issue to consider is whether they should be registered as broker-dealers.

[12]   A PIPE transaction involves the unregistered sale of stock in a publicly owned company to private investors. *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 814 (S.D.N.Y. 2006). The stock sold in a PIPE offering is not freely transferable until the issuer registers the sales with the Commission. *Id.* at 814-15.

3

usually plummets, and innocent investors who paid a premium price are left holding often virtually worthless shares.[13]

Money laundering activities can also be facilitated through the trading of penny stocks. Some money laundering red flags include: a customer who has a questionable background or is the subject of news reports indicating possible criminal, civil, or regulatory violations; multiple accounts in the names of family members or corporate entities for no apparent business or other purpose; wire transfers to or from countries identified as money laundering risks or tax havens; and excessive journal entries between unrelated accounts.[14]

## II.   Bloomfield and Martin established a penny stock business at Leeb.

Bloomfield and Martin worked as a team specializing in penny stock transactions at a succession of broker-dealers. Before joining Leeb, they worked at a branch office of Western International Securities, Inc., where Western had concerns raised by the penny stock trading of their customers Darrel Uselton and his relative Jack Uselton, sometimes aided by Mark Uselton, another relative who was a market maker. Western's Chief Compliance Officer ("CCO"), Craig Watanabe, testified that he observed large volumes of penny stocks being deposited into the Useltons' accounts, sales of those stocks to the public, and wire transfers of funds out of the accounts, a pattern he viewed as indicative of fraudulent manipulation of penny stocks. Watanabe had frequent discussions with Bloomfield and Martin about his suspicions while they were at Western, but they took no action in response. Approximately six months after Bloomfield and Martin joined Western, Watanabe informed them that Western was "exercising its right to discontinue doing business with all clients who conduct penny stock business." Bloomfield and Martin left Western soon thereafter. Western filed Forms U5 (Uniform Termination Notice of Securities Industry Registration) with NASD stating that the terminations were "voluntary."

After leaving Western, Bloomfield contacted Eugene Miller, chief executive officer ("CEO") and president of Leeb, about working for Leeb.[15] In March 2005, Leeb applied to NASD to establish an OSJ in California where Bloomfield and Martin would operate their penny stock

---

[13]   *See Microcap Stock: A Guide for Investors*, http://www.sec.gov/investor/pubs/microcapstock.htm (discussing classic "pump-and-dump" scheme).

[14]   *See*, *e.g.*, NASD Notice to Members 02-21, 2002 WL 544766, at *11-12 (Apr. 2002) (NASD Provides Guidance To Member Firms Concerning Anti-Money Laundering Compliance Programs Required By Federal Law).

[15]   Miller was a respondent in this proceeding, but he settled the allegations against him. The Commission ordered him to cease and desist from committing or causing any violations or future violations of Exchange Act Section 17(a) and Exchange Act Rule 17a-8, suspended him from association in a supervisory capacity with any broker or dealer for twelve months, and required him to pay a $50,000 civil money penalty. *See Ronald S. Bloomfield*, Exchange Act Rel. No. 62750, 2010 WL 3284729, at *4 (Aug. 20, 2010).

4

business. Leeb's application stated that Gorgia, who worked in the firm's New York office, would supervise Bloomfield and that Bloomfield, in turn, would supervise Martin.

Martin became associated with Leeb in November 2004. Bloomfield followed Martin to Leeb in August 2005 after NASD approved Leeb's application for an OSJ with Bloomfield as the direct supervisor of Martin and as the AML officer of the OSJ.[16] Bloomfield and Martin took their customers, including the Useltons, with them to Leeb, where they were jointly listed on customer accounts and Bloomfield shared in Martin's commissions. Although Martin typically handled the execution of trades, Bloomfield would enter orders in his absence. All orders were unsolicited.[17]

### A.   Many Bloomfield and Martin accounts presented indicia of illegal, unregistered securities transactions, market manipulation, money laundering, and tax evasion, and Bloomfield and Martin failed to do anything in response.

At least six Bloomfield and Martin accounts were controlled by the Useltons (collectively, the "Uselton accounts"). Five of those accounts were in the names of entities the Useltons controlled directly: Firemark Capital LLC; Ibis Energy LLC; OTC Services, Inc.; Valores Fund LP; and Warrior Capital LLC. The sixth account was in the name of Scott Sieck, a minority partner in Warrior Capital. At all relevant times, Bloomfield and Martin knew that Darrel Uselton was a stock promoter who received issuers' stock in return for promotional services. Bloomfield and Martin also knew that the Useltons and Sieck had disciplinary records.[18]  In fact, Bloomfield admitted in

---

[16]   NASD Conduct Rule 3010(a) requires that each member establish and maintain a system to supervise the activities of each registered representative and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations and with NASD rules. NASD Conduct Rule 3010(a)(4) requires the designation of one or more appropriately registered principals in each OSJ.

[17]   During the relevant period, most of Leeb's business involved transactions in penny stocks. Leeb accounts sold over three billion shares and purchased a little over 557 million shares. The penny stock business was profitable for Leeb and its customers. Trading of shares priced at $5 or less generated net proceeds of $130 million.

[18]   For instance, in February 1999, Sieck consented to an order permanently enjoining him from violating Securities Act Sections 5 and 17(a) and Exchange Act Section 10(b) and Exchange Act Rule 10b-5, and assessing a $16,000 civil penalty. *See SEC v. Craig*, No. 99-6165 (S.D. Fla.), Lit. Rel. No. 16056, 1999 WL 61418, at *1 (Feb. 10, 1999).

In October 2002, Jack Uselton entered into a consent agreement with the Commission in a civil action in which he was charged with participating in an illegal "pump-and-dump" scheme. *See SEC v. Christensen*, No. H01-3203 (S.D. Tex.), Lit. Rel. No. 17787, 2002 WL 31309915, at *1 (Oct. 16, 2002). Jack Uselton agreed to be permanently enjoined from violating antifraud provisions and barred from serving as an officer or director of a public company.

In September 2003, Mark Uselton consented to NASD findings that he engaged in a securities business when his firm's net capital was below the required minimum, failed to provide notification

(continued…)

5

investigative testimony that Jack Uselton's 2002 consent agreement with the Commission regarding a "pump-and-dump" scheme raised a red flag of possible unlawful distributions.

The trading pattern in the Uselton accounts at Leeb repeated the pattern observed by Watanabe at Western. The accounts received large blocks of privately obtained shares of obscure penny stocks. Although the securities initially traded at low prices and in low volumes, the prices of, and trading volume in, these securities quickly escalated around the time of large deposits into the Uselton accounts. The escalation in prices and trading volume was generally associated with coordinated transactions among the various Uselton accounts and often accompanied by spam email campaigns touting the issuers' prospects. Once prices had risen substantially, the accounts started selling blocks of stocks. Eventually the stocks' prices collapsed. These indicia raised red flags of a possible unlawful distribution and market manipulation. During the relevant period, the Useltons and Sieck deposited the shares of 115 different issuers into their Leeb accounts and sold 381.8 million shares to the public for a total of $38.8 million in proceeds.

A seventh Bloomfield and Martin account, Thimble Capital Ltd., engaged in a trading pattern similar to that of the Uselton accounts and presented equally troubling signs of possible wrongdoing. Thimble became a customer of Bloomfield and Martin as a result of a referral from Darrel Uselton. Thimble was incorporated in Nevis, West Indies, with an office in Vancouver, British Columbia, Canada; its traders placed orders from Costa Rica and Panama. Thimble's purported owner, Michael Laidlaw, who was also a principal of Corporate House, a Canadian entity, established the Thimble account. But, while servicing the Thimble account, Bloomfield's and Martin's main contacts were with three individuals, another Corporate House official and two

---

(…continued)

that his firm's net capital was below the required minimum, failed to file an accurate FOCUS report, failed to timely file an annual audited financial statement, and failed to maintain copies of the firm's general ledger and month-end trial balances. NASD fined him $7,500 and suspended him for six months as a financial and operations principal and for three months as a general securities principal. *See Notices to Members, Disciplinary and Other NASD Actions*, 2003 WL 22262477, at *17-18 (Sept. 15, 2003).

In February 2004, Darrel and Mark Uselton consented to NASD findings that they caused a member firm to engage in a securities business when the firm's net capital was below the required minimum, that they failed to ensure the preparation and maintenance of accurate books and records, and that Darrel Uselton acted as a general securities principal without being registered in such capacity. NASD fined Darrel Uselton $15,000 and suspended him for one year as a general securities principal and for six months in all capacities. NASD fined Mark Uselton $5,000 and suspended him for six months in a financial or operations capacity. *See Notices to Members, Disciplinary and Other NASD Actions*, 2004 WL 527363, at *19-20 (Mar. 15, 2004).

In March 2005, Darrel Uselton consented to NASD findings that he executed an "Asset Purchase Agreement" without obtaining NASD's prior approval as required. NASD fined him $10,000 and suspended him for six months in a principal capacity. *See* http://disciplinaryactions.finra.org/viewdocument.aspx?DocNB=10947.

6

traders in Central America, who never provided Leeb with written authority over the account. Neither Bloomfield nor Martin sought information about Thimble, such as its connection to Nevis, relationship to Laidlaw and Corporate House, or the persons legally authorized to act on its behalf.

Thimble's receipt of large amounts of penny stocks, participation in unexplained price and trading volume surges, and sale of those stocks coincident with the start of spam email campaigns (followed, in one instance, by a Commission-imposed trading suspension based on questions concerning the legitimacy of the issuer, Golden Apple Oil and Gas, Inc. ("GAPJ")), raised red flags of a possible unlawful distribution and market manipulation. The trading pattern in the Thimble account also suggested possible money laundering or tax evasion, given the background of Thimble, the frequency with which penny stocks were deposited and then sold, and the regular wiring of sale proceeds to a bank account in Liechtenstein, a bank-secrecy jurisdiction and known tax haven. During the relevant period, Thimble deposited the shares of 68 different issuers into its Leeb account and sold 98.3 million shares to the public for a total of $46.1 million in proceeds, of which more than $40 million was wired to its Liechtenstein account.

### B.    Bloomfield and Martin received multiple warnings about the possibility of illegal activity in customer accounts and failed to do anything in response.

During the relevant period, Leeb's clearing firm, Pershing LLC, raised concerns with Leeb that the increasing frequency in what appeared to be PIPE transactions in Leeb accounts, particularly at the OSJ, looked suspicious. In March 2005, Pershing closed seven Leeb accounts, including six accounts at the OSJ, based on those concerns. Bloomfield and Martin, as the brokers of record on the six OSJ accounts, would have known of the closure of those accounts. In the ensuing months, Pershing continued to express its concerns to Leeb. Finally, in December 2005, Pershing terminated its clearing arrangement with Leeb based on ongoing, unresolved concerns about possible illegal activity in customer accounts.

Leeb entered into a new clearing arrangement with Legent Clearing LLC, and Legent soon raised the same concerns about activity in OSJ accounts as had Pershing. A July 2006 email from Legent to Bloomfield questioned "penny stock transactions, journaling of securities, and wiring of large amounts of cash" in four accounts connected to the Useltons.[19] The same email also questioned Bloomfield's statement that his due diligence in accepting the Uselton accounts had been sufficient given the Useltons' prior disciplinary records. The email further noted several "high dollar" wire transfers sent from the Uselton accounts and advised that this movement of funds should be monitored. Bloomfield did nothing in response.

From August to November 2006, Legent emailed Bloomfield with notifications of reported regulatory action taken against various OSJ customers. In response to a notice of regulatory action by the State of Oklahoma against Darrel Uselton, Bloomfield told Legent that the action "was related to the closing down of [Darrel Uselton's] B/D [broker-dealer] about three years ago. This

---

[19]   Pershing had also used the term "journaling" in its communications to Gorgia. Pershing defined "journaling" as a book-keeping entry moving securities from one account to another.

7

was known to us and unless there is anything more, we have assess[ed] the risk and will continue to do business with him."

In September 2006, Legent emailed Bloomfield that the Uselton accounts would be frozen from activity until it received new account and due diligence documentation. Martin, who was jointly listed with Bloomfield as the registered representatives on the Uselton accounts, would have known of this action. Legent also requested an explanation of the source of certain stocks delivered into the Uselton accounts and why so many businesses under the Useltons' control were performing the same services. Legent advised that it would be investigating whether fraudulent activity was being conducted through the Uselton accounts.[20]

### C.   Bloomfield and Martin failed to conduct a reasonable inquiry into the source of their customers' stocks.

Martin testified that when a new customer brought in shares he would perform an initial screening and Bloomfield would complete the paperwork. Martin stated that he typically asked his customers where they had obtained their penny stock, what they paid for it, if they had purchased the stock in a private transaction, and how long they had held the stock. But Martin admitted that he did not always ask these questions and that, when he did, he wrote nothing down. Martin also admitted that he never sought documentation concerning how his customers obtained their penny stocks. He believed that if a stock certificate did not contain a restrictive legend and was cleared for selling, the stock would be freely tradable.[21] Martin stated that he knew his customers and their backgrounds, his customers "knew what the rules were," and "common sense" told him that they would not deposit restricted stock into their Leeb accounts. For example, if Darrel Uselton represented to Martin that the penny stocks deposited into the Uselton accounts were "clean," the stocks had to be "clean."[22] Martin considered the persons associated with Thimble to be honest

---

[20]   In March 2009, Jack and Darrel Uselton settled Commission charges that they engaged in market manipulations involving at least thirteen penny stock companies from May 2005 to December 2006. *See SEC v. Uselton*, No. 07-2211 (S.D. Tex.), Lit. Rel. No. 20961, 2009 WL 700808, at *1 (Mar. 18, 2009). The Useltons agreed to be permanently enjoined from violating Exchange Act Section 10(b) and Exchange Act Rule 10b-5 and barred from participating in penny stock offerings. *Id.* In a related case pursued by the State of Texas, Jack and Darrel Uselton were charged with securities fraud and other criminal activities. *See id.* In October 2010, FINRA barred Mark Uselton from association with a FINRA member in any capacity and expelled his firm from FINRA membership. *See Dep't of Enforcement v. Legacy Trading Co., LLC*, Complaint No. 2005000879302, 2010 WL 3950341, at *16 (NAC Oct. 8, 2010).

[21]   A restrictive legend is "a statement placed on restricted stock notifying the holder that the stock may not be resold without registration." *Charles F. Kirby*, Exchange Act Rel. No. 47149, 56 SEC 44, 2003 WL 71681, at *2 (Jan. 9, 2003), *petition denied sub nom.*, *Geiger v. SEC*, 363 F.3d 481 (D.C. Cir. 2004).

8

investors because they traded in dozens of stocks, and "[o]ne guy was Phi Beta Kappa from Stanford, an international economist who wrote books."

Bloomfield testified that his role was to perform a cursory check of Martin's work and to tie up "loose ends." Bloomfield stated that he conducted a reasonable inquiry of every stock deposited into his customers' accounts. But, like Martin, Bloomfield never asked for documentation concerning how his customers obtained their stocks. His reasonable inquiry procedures consisted of consulting the "Pink Sheets,"[23] the issuer's website, and two trading platforms showing a stock's history. Although he knew Darrel Uselton was a stock promoter, he did not ask if Darrel Uselton was promoting the stocks sold out of the Uselton accounts because he did not think it was relevant. He assumed that his customers' penny stocks were not restricted if the stock certificates did not contain a restrictive legend.

## III.   Bloomfield and Martin violated registration requirements.

Securities Act Sections 5(a) and 5(c) prohibit the "sale" and "offer for sale" of securities in interstate commerce unless a registration statement has been filed or is in effect with respect to those securities or there is an applicable exemption from the registration requirements.[24] Registration of securities protects "investors by promoting full disclosure of information thought necessary to informed investment decisions."[25]   We have stated that "[t]his policy is equally applicable to the distribution of a new issue and to a redistribution of outstanding securities which 'takes on the characteristics of a new offering by reason of the control of the issuer possessed by those responsible for the offering.'"[26]

---

(...continued)

[22]   Martin worked as a trader, market maker, and investor for several years for one of Darrel Uselton's companies, National Capital; they were close friends.

[23]   "Pink Sheets" was the name commonly associated with an electronic quotation system that displayed quotes and last sale information for many over-the-counter securities. That system is now operated by OTC Markets Group, Inc.

[24]   15 U.S.C. §§ 77e(a), 77e(c).

[25]   *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953).

[26]   *Ira Haupt & Co.*, Exchange Act Rel. No. 3845, 23 SEC 589, 1946 WL 24150, at *5 (Aug. 20, 1946) (quoting *Report of Committee on Interstate and Foreign Commerce*, 73D CONG., 1ST SESS., H.R. Rep. No. 85 at 592 (1933)); *see also Pennaluna & Co., Inc. v. SEC*, 410 F.2d 861, 865 (9th Cir. 1969) (stating that "the presumptive need for registration implicit in § 5 extends to all secondary distributions not insignificant in their proportions"). The term "'distribution' refers to the entire process in a public offering through which a block of securities is dispersed and ultimately comes to rest in the hands of the investing public." *Jacob Wonsover*, Exchange Act Rel. No. 41123, 54 SEC 1, 1999 WL 100935, at *6 n.25 (Mar. 1, 1999), *petition denied*, 205 F.3d 408 (D.C. Cir. 2000).

9

The elements of a *prima facie* case for a violation of Securities Act Section 5 are that: (1) the respondents, directly or indirectly, sold or offered to sell securities; (2) through the use of interstate facilities or the mails; (3) when no registration statement was in effect or filed as to those securities.[27]  A showing of scienter, *i.e.*, an intent to deceive, manipulate, or defraud,[28] is not required.[29]  Bloomfield and Martin do not dispute that the Division established a *prima facie* case that they sold, or offered to sell, on behalf of the Uselton and Thimble accounts, the shares of nine issuers specifically identified in the Order Instituting Proceedings for which no registration statements were in effect or filed.[30]

Once the Division establishes a *prima facie* case, the burden shifts to the respondents to prove the availability of an exemption from registration.[31]  Registration exemptions are affirmative defenses that are construed strictly to promote full disclosure of information for the protection of investors.[32]  Evidence supporting an exemption must be "explicit, exact, and not built on conclusionary statements."[33]

Bloomfield and Martin argue that the penny stock transactions effected on behalf of the Uselton and Thimble accounts were exempt from registration under Securities Act Section 4(a)(4), which exempts "brokers' transactions executed upon customers' orders on any exchange or in the over-the-counter market but not the solicitation of such orders."[34]  We have long held that the Section 4(a)(4) exemption "is not available when the broker knows or has reasonable ground[s] to believe that his customer is an underwriter since in that event the broker likewise violates Section 5 by participating in a non-exempt transaction."[35]  Thus, "[a] broker-dealer (and its registered

---

[27]  *See, e.g.*, *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006); *SEC v. Calvo*, 378 F.3d 1211, 1214-15 (11th Cir. 2004).

[28]  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

[29]  *See, e.g.*, *Calvo*, 378 F.3d at 1215; *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1047 (2d Cir. 1976).

[30]  Adrenaline Nation Entertainment, Inc., Equipment and Systems Engineering, Inc., Spooz, Inc., and Viya Technologies traded in the Uselton accounts. China Gold Corp., Golden Apple Oil and Gas, Inc., Goldmark Industries, Inc., iPackets International, Inc., and LOM Logistics, Inc. traded in the Thimble account.

[31]  *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1086 (9th Cir. 2010); *Cavanagh*, 445 F.3d at 111 n.13; *see Ralston Purina Co.*, 346 U.S. at 126.

[32]  *See, e.g.*, *Cavanagh*, 445 F.3d at 115; *SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980).

[33]  *Lively v. Hirschfeld*, 440 F.2d 631, 633 (10th Cir. 1971).

[34]  15 U.S.C. § 77d(4). In 2012, Securities Act Section 4(4) was redesignated as Section 4(a)(4) by the JOBS Act. *See* Jumpstart Our Business Startups Act, Pub. L. No. 112-106, §§ 201(b)(1), (c)(1), 126 Stat. 306, 314 (2012).

[35]  *Stone Summers & Co.*, Exchange Act Rel. No. 9839, 45 SEC 105, 1972 WL 121299, at *2

(continued…)

representative) relying on Section 4(a)(4) cannot act as a mere order-taker. It must make whatever inquiries are necessary under the circumstances to ensure that its customer is not an underwriter."[36]

The amount of inquiry required necessarily varies with the circumstances. As we observed over half a century ago:

> A dealer who is offered a modest amount of a widely traded security by a responsible customer, whose lack of relationship to the issuer is well known to him, may ordinarily proceed with considerable confidence. On the other hand, when a dealer is offered a substantial block of a little-known security, either by persons who appear reluctant to disclose exactly where the securities came from, or where the surrounding circumstances raise a question as to whether or not the ostensible sellers may be merely intermediaries for controlling persons or statutory underwriters, then searching inquiry is called for.

> The problem becomes particularly acute where substantial amounts of a previously little known security appear in the trading markets within a fairly short period of time and without the benefit of registration under the Securities Act of 1933. In such situations, it must be assumed that these securities emanate from the issuer or

---

(…continued)
(Nov. 3, 1972); *see also, e.g.*, *World Trade Fin. Corp. v. SEC*, 739 F.3d 1243, 1248 (9th Cir. 2014) ("We agree with the Commission and the D.C. Circuit that a broker is not merely an 'order taker,' and must conduct a reasonable inquiry into the circumstances surrounding the transaction before the broker may claim the protection of the Section 4(4) brokers' exemption.   The broker's reasonable inquiry is important because 'violations of the antifraud and other provisions of the securities laws frequently depend for their consummation . . . on the activities of broker-dealers who fail to make diligent inquiry to obtain sufficient information to justify their activity in the security.'") (quoting *Laser Arms Corp.*, Exchange Act Rel. No. 28878, 1991 WL 292009, at *14 n.35 (Feb. 14, 1991))*John A. Carley*, Exchange Act Rel. No. 57246, 2008 WL 268598, at *8 & n.40 (Jan. 31, 2008) (Securities Act Section 4(a)(4) exemption is not available if the registered representative "knows or has reasonable grounds to believe that the selling customer's part of the transaction is not exempt from [Securities Act] Section 5") (citing authorities), *aff'd in relevant part sub nom.*, *Zacharias v. SEC*, 569 F.2d 458 (D.C. Cir. 2009).

[36]   *Evans & Co., Inc.*, Exchange Act Rel. No. 21696, 48 SEC 96, 1985 WL 548642, at *5 (Jan. 30, 1985); *see also Carley*, 2008 WL 268598, at *8 & n.41 (noting that brokers have a "duty of inquiry" into the facts surrounding a proposed sale). The Securities Act defines "underwriter" as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking[.]" 15 U.S.C. § 77b(a)(11). As used in the definition of "underwriter," an "issuer" includes "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." *Id.*

11

from persons controlling the issuer, unless some other source is known and the fact that the certificates may be registered in the names of various individuals could merely indicate that those responsible for the distribution are attempting to cover their tracks.[37]

This duty of inquiry extends to both the firm and the registered representative executing the transaction.[38] Both, as agents for their customers, "have a responsibility to be aware of the requirements necessary to establish an exemption from the registration requirements of the Securities Act and should be reasonably certain such an exemption is available."[39]

In this case, there were a number of factors that should have led Bloomfield and Martin to conduct the "searching inquiry" called for by our precedent. The penny stock transactions at issue presented all of the classic indicia that the principals in the Uselton and Thimble accounts were acting as underwriters. The Uselton and Thimble accounts received deposits of large blocks of recently issued, little-known low-priced stocks that the customers obtained privately and not through a registered offering. Shortly thereafter, these customers directed Bloomfield and Martin to sell the stocks to the public, and in both sets of accounts the sales often coincided with spam email campaigns.[40] Moreover, with respect to the Uselton accounts, Bloomfield and Martin knew that Darrel Uselton generally provided promotional services to issuers and received issuers' stock in exchange for his services. They also knew that Darrel Uselton intended to use his Leeb accounts to liquidate penny stocks. Given these circumstances, Bloomfield and Martin should have conducted a "searching" inquiry into the facts surrounding the proposed sales.[41]

But Bloomfield and Martin conducted essentially no inquiry into the Useltons' and Thimble's proposed stock sales. Both Bloomfield and Martin admitted that they never asked for documentation concerning the transactions in which their customers obtained their shares. Instead, with respect to the Uselton accounts, notwithstanding the Useltons' extensive disciplinary history and the fact that Western had raised concerns regarding the pattern of trading in the Uselton accounts, Martin relied on Darrel Uselton's assertions that the penny stocks deposited into his Leeb accounts were "clean." With respect to the Thimble account, Martin relied on the fact that he

[37]  *Distribution by Broker-Dealers of Unregistered Securities*, Exchange Act Rel. No. 6721, 1962 WL 69442, at *1-2 (Feb. 2, 1962); *World Trade Fin. Corp.*, 739 F.3d at 1248 (same).

[38]  *See Robert G. Leigh*, Exchange Act Rel. No. 27667, 50 SEC 189, 1990 WL 1104369, at *4 (Feb. 1, 1990).

[39]  *Stone Summers & Co.*, 1972 WL 121299, at *3 & n.12.

[40]  *See Wonsover*, 1999 WL 100935, at *6 n.25 (stating that "[a] distribution within a relatively short period after acquisition is evidence of an original intent to distribute").

[41]  "Basic information concerning the issuer such as its address, business activities, principals, products, assets, financial condition and number of shares of stock outstanding, should be obtained independently as a matter of course." *Sales of Unregistered Securities by Broker-Dealers*, Exchange Act Rel. No. 9239, 1971 WL 127558, at *2 (July 7, 1971).

12

thought one of the persons associated with Thimble was a Phi Beta Kappa graduate of Stanford who wrote books. For his part, Bloomfield admittedly engaged in only a cursory check of Martin's work and did not ask Darrel Uselton about the source of his penny stocks. Far from engaging in a "searching inquiry" into the facts surrounding their customers' proposed sales, Martin and Bloomfield acted in reckless disregard of whether their customers were underwriters.

The only evidence Bloomfield and Martin produced to show that they conducted any inquiries was their own testimony, which the law judge did not credit.[42]  In any event, their admissions that they never asked for documentation concerning the transactions in which their customers obtained their shares alone undermine their assertions that they satisfied their duty of reasonable inquiry. On these facts, we find that Bloomfield and Martin failed to conduct the necessary inquiries under the circumstances and therefore they have not met their burden of establishing that they were entitled to the Securities Act Section 4(a)(4) exemption.[43]  As a result, we find that they willfully[44] violated Securities Act Sections 5(a) and 5(c).[45]

Bloomfield and Martin raise numerous arguments against liability, none of which has merit. They analogize the Division's establishment of a *prima facie* case under Securities Act Section 5 to the elements of an aiding-and-abetting analysis and argue that the Division failed to show a primary securities law violation by another party. But Bloomfield and Martin were not charged with aiding and abetting a Section 5 violation; rather, they were charged as primary participants in the unlawful distribution of unregistered penny stock, which the ample evidence previously discussed establishes.

---

[42]  A law judge's credibility findings are entitled to considerable weight in the absence of substantial evidence to the contrary. *Anthony Tricarico*, Exchange Act Rel. No. 32356, 51 SEC 457, 1993 WL 183678, at *3 (May 24, 1993). None of the respondents has shown, nor do we find, substantial evidence contradicting the law judge's adverse credibility findings.

[43]  *See, e.g.*, *Leigh*, 1990 WL 1104369, at *4 (Securities Act Section 4(a)(4) exemption was unavailable where registered representative failed to make an adequate inquiry); *Stone Summers & Co.*, 1972 WL 121299, at *3 (Securities Act Section 4(a)(4) exemption was unavailable where "respondents made no serious effort to determine the source and the circumstances of the acquisitions of such stock and did not even question either of the sellers").

[44]  Willfulness is shown where a person intends to commit an act that constitutes a violation; there is no requirement that the actor also be aware that he is violating any statutes or regulations. *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000).

[45]  Securities Act Section 5 liability attaches to those who have a "significant role" in an unregistered sale, *i.e.*, if a person is a "necessary participant" and a "substantial factor" in the unregistered sale. *See, e.g.*, *SEC v. Zacharias*, 569 F.3d 458, 464 (D.C. Cir. 2009); *SEC v. Phan*, 500 F.3d 895, 906 (9th Cir. 2007); *Calvo*, 378 F.3d at 1215. Bloomfield and Martin were "necessary participants" and "substantial factors" for purposes of primary liability under Section 5 because they both played an indispensable role in brokering the transactions at issue.

13

Bloomfield and Martin argue that the Division was required to prove that their customers' securities sales involved "underwriters" and were part of an unlawful distribution. This argument improperly shifts the burden of disproving an exemption to the Division. As stated above, once the Division establishes a *prima facie* Securities Act Section 5 violation, the burden shifts to the respondents to show that an exemption applied.[46] As discussed, Bloomfield and Martin failed to meet that burden.

Bloomfield and Martin also argue that they met their burden by showing that their customers' transactions were unsolicited. To the extent Bloomfield and Martin are relying on Securities Act Rule 144(g), their argument ignores the provision in Rule 144(g)(4) that, in addition to satisfying the requirements of Rule 144(g)(1) through (g)(3),[47] the registered representative must make a reasonable inquiry to ascertain whether his customers are "underwriters" or the proposed sales are part of a distribution of securities of an issuer or a person controlling the issuer.[48] Bloomfield and Martin are ineligible for the Securities Act Section 4(a)(4) exemption because, as set forth above, they failed to conduct such an inquiry.[49]

Bloomfield and Martin next argue that they relied on the face of stock certificates to determine whether a particular stock was restricted. But the absence of a restrictive legend on the face of a stock certificate does not relieve a broker of his duty of inquiry.[50] Registered representatives, "as professionals in the securities business and as persons dealing closely with the

---

[46]   *See Cavanagh*, 445 F.3d at 111 n.13 (citing *Ralston Purina Co.*, 346 U.S. at 126).

[47]   Those subsections provide that the term "brokers' transactions" in Securities Act Section 4(a)(4) includes transactions by a broker in which such broker: (1) does no more than execute orders to sell the securities as agent for the person for whose account the securities are sold; (2) receives no more than the usual and customary broker's commission; and (3) neither solicits nor arranges for the solicitation of customers' orders to buy the securities in anticipation of or in connection with the transaction. 17 C.F.R. § 230.144(g)(1)-(3).

[48]   17 C.F.R. § 230.144(g)(4).

[49]   *See, e.g.*, *World Trade Fin. Corp.*, Exchange Act Rel. No. 66114, 2012 WL 32121, at *9 (Jan. 6, 2012) (stating that the Commission has "long recognized that unregistered sales of large blocks of securities by brokers 'without [the use of] solicitations or other sales activities' may nonetheless violate the registration requirements" because brokers "must make whatever inquiries are necessary under the circumstances to determine that the transaction is only a normal 'broker's transaction' and not part of an unlawful distribution") (alteration in original), *petition denied*, 739 F.3d 1243 (9th Cir. 2014).

[50]   *See Carley*, 2008 WL 268598, at *11 n.55 (stating that absence of restrictive legends on stock certificates does not warrant conclusion that stocks are freely tradable); *Leigh*, 1990 WL 1104369 ("[A]s the courts and this Commission have held, the transfer agent's willingness to reissue the certificates without restrictive legends did not relieve [the broker] of his obligation to investigate.").

14

investing public, are expected to secure compliance with the requirements of the [Securities] Act to protect the public from illegal offerings."[51]  Bloomfield's and Martin's reliance on the face of stock certificates did not reasonably secure such compliance. Moreover, testimony established that some of the stock certificates at issue did have restrictive legends.

Bloomfield and Martin further argue that they justifiably relied on third parties, *i.e.*, the transfer agent, Leeb's clearing firms, and their superiors in the New York office, to police their customers' transactions. But, as experienced securities professionals, Bloomfield and Martin were required to conduct their own inquiry into the source of their customers' stock and could not rely on others without reasonably exploring the possibility of contrary facts.[52]

Bloomfield and Martin argue that the law judge erred in admitting the Division's expert's testimony and report. A law judge has broad discretion in determining whether to admit or exclude such evidence,[53] and we find no abuse of discretion here. Furthermore, we have made a *de novo* review of the evidence and determined that, even if the Division's expert had not been permitted to testify and his report had been excluded, it would not alter our conclusion that Bloomfield and Martin violated registration requirements during the relevant period.

Finally, Bloomfield and Martin argue that the law judge's initial decision was vague and therefore violated due process, our Rules of Practice, and the Administrative Procedure Act. We find no such violations. In any event, our *de novo* review of the record cures whatever errors, if any, may have been committed below.[54]

---

[51]  *Quinn & Co v. SEC*, 452 F.2d 943, 946 (10th Cir. 1971), *cert. denied*, 406 U.S. 957 (1972); *see also*, *e.g.*, *Kane v. SEC*, 842 F.2d 194, 198 (8th Cir. 1988) ("[S]ection 5 liability extends to those persons who are uniquely positioned to ask relevant questions, acquire material information, or disclose their findings" regarding an illegal distribution).

[52]  *See*, *e.g.*, *World Trade Fin. Corp.*, 739 F.3d at 1249 (rejecting brokers' reliance on third parties and stating that "brokers rely on third-parties at their own peril, and will not avoid liability through that reliance when the duty of reasonable inquiry rests with the brokers")*Wonsover*, 205 F.3d at 415 (rejecting registered representative's reliance on clearing firm, transfer agent, and counsel); *Kane*, 842 F.2d at 200 (rejecting petitioner's "reliance on the self-serving statements of his seller"); *Sorrell v. SEC*, 679 F.2d 1323, 1327 (9th Cir. 1982) (stating that broker's reliance on counsel's advice did not excuse his own lack of investigation); *Feeney v. SEC*, 564 F.2d 260, 262 (8th Cir. 1977) (rejecting petitioners' "claim that they were entitled to rely on the assurances of the other company officers that registration was not required").

[53]  *See*, *e.g.*, *Pagel, Inc.*, Exchange Act Rel. No. 22280, 48 SEC 223, 1985 WL 548387, at *5 (Aug. 1, 1985), *aff'd*, 903 F.2d 942 (8th Cir. 1986).

[54]  *See*, *e.g.*, *Heath v. SEC*, 586 F.3d 122, 142 (2d Cir. 2009) (stating that, "because the SEC conducted a thorough, *de novo* review of the record, any procedural errors that may have been committed by the [NYSE's] Chief Hearing Officer are cured"), *cert. denied*, 130 S. Ct. 2351 (2010); *Gregory M. Dearlove*, Exchange Act Rel. No. 57244, 2008 WL 281105, at *10 & n.42

(continued…)

15

## IV.    Gorgia failed to discharge his supervisory responsibilities.

### A.    Gorgia supervised Bloomfield and Martin.

"[D]etermining if a particular person is a 'supervisor' depends on whether, under the facts and circumstances of a particular case, that person has a requisite degree of responsibility, ability or authority to affect the conduct of the employee whose behavior is at issue."[55] "In each situation a person's actual responsibilities and authority . . . will determine whether he . . . is a 'supervisor' for purposes of [Exchange Act] Sections 15(b)(4)(E) and (6)," rather than his "line" or "non-line" status or job title.[56]

In a small or mid-size firm like Leeb, senior managers often wear many hats. Such was the case with Gorgia, one of only two senior managers, the other being Leeb president Miller. Gorgia was hired to serve as Leeb's CFO and Financial and Operations Principal.[57] Later on, he assumed the titles of CCO and AML Program Supervisor.[58] In addition, Leeb's Written Supervisory Procedures ("WSP") manual identified Gorgia, along with Miller, as a Producing Manager[59] and as a supervisor for numerous business areas of the firm. Furthermore, and most significantly, Leeb's

---

(…continued)
(Jan. 31, 2008) (concluding that *de novo* review cured any error by law judge to properly support findings), *petition denied*, 573 F.3d 801 (D.C. Cir. 2009).

[55]    *George J. Kolar*, Exchange Act Rel. No. 46127, 55 SEC 1009, 2002 WL 1393652, at *4 (June 26, 2002) (quoting *John H. Gutfreund*, Exchange Act Rel. No. 31554, 51 SEC 93, 1992 WL 362753, at *15 (Dec. 3, 1992)).

[56]    *Gutfreund*, 1992 WL 362753, at *15 n.24.

[57]    Gorgia became associated with Leeb in December 2004 and resigned effective July 2006. Throughout his tenure, Gorgia worked twenty hours per week.

[58]    Leeb's AML compliance manual ("AML manual") differentiates between the duties in the AML program performed by Gorgia in his capacity as CCO and those performed by him in his capacity as AML Program Supervisor.

[59]    Leeb's WSP manual defines the term "Producing Manager" to include "Branch Office Managers, sales managers, regional or district sales managers, or any person performing a similar supervisory function." (emphasis removed from original). As Producing Managers, Gorgia and Miller were responsible for supervising each other's account activity.

16

March 2005 application to NASD seeking permission to establish the OSJ[60] specifically designated Gorgia as Bloomfield's supervisor.[61]

Gorgia's testimony confirms that he was Bloomfield's supervisor in fact, not just in title. With respect to the OSJ's activities, Gorgia testified that he believed that he had "unfettered" authority to act as necessary, including the authority to dismiss Bloomfield, to "shut down" Bloomfield's and Martin's penny stock business, and to close the OSJ. As we have held, an individual's ability to discipline and, especially, to fire an employee are indicia of supervisory authority over that employee.[62] We believe that the evidence also establishes that Gorgia had the "requisite degree of responsibility, ability or authority" to affect both Bloomfield's and Martin's conduct.[63] As Bloomfield's supervisor, Gorgia exercised control over Martin's conduct by virtue of his direct oversight of Bloomfield. Accordingly, we conclude that Gorgia was Bloomfield's and Martin's supervisor for the purposes of Exchange Act Sections 15(b)(4)(E) and 15(b)(6).

**B.      Gorgia failed reasonably to supervise Bloomfield and Martin.**

Exchange Act Section 15(b)(6), incorporating Exchange Act Section 15(b)(4)(E) by reference, allows us to sanction a person associated with a broker-dealer if that person "has failed reasonably to supervise, with a view to preventing violations of [the federal securities laws], another person who commits such a violation, if such other person is subject to his supervision."64 "The supervisory obligations imposed by the federal securities laws require a vigorous response even to indications of wrongdoing."65 "'Red flags and suggestions of irregularities demand inquiry

---

[60]    Leeb's WSP manual was never revised to reflect the establishment of the OSJ.

[61]    In a July 2005 follow-up letter to NASD regarding the OSJ, Gorgia stated that Bloomfield would be supervised by both Leeb president Miller and himself, even though the March 2005 application to NASD made no mention of any sharing of supervisory responsibility. The fact that Gorgia may have shared with Miller in the supervision of Bloomfield did not relieve Gorgia of his own supervisory responsibilities. *See, e.g., Kolar*, 2002 WL 1393652, at *5 ("The fact that control is shared with others, or subject to countermand at a higher level, does not negate its existence.") & n.14 (citing cases).

[62]    *See, e.g., Midas Sec., LLC*, Exchange Act Rel. No. 66200, 2012 WL 169138, at *13 & n.73 (Jan. 20, 2012).

[63]    *See Gutfreund*, 1992 WL 362753, at *15.

[64]    15 U.S.C. §§ 78o(b)(4)(E), 78o(b)(6).

[65]    *Gutfreund*, 1992 WL 362753, at *15.

17

as well as adequate follow-up and review. When indications of impropriety reach the attention of those in authority, they must act decisively to detect and prevent violations of the securities laws.'"[66]

There were numerous red flags that should have alerted Gorgia to the need for inquiry and a thorough review of Bloomfield's and Martin's activities. For instance, Gorgia testified that he knew from the start that Bloomfield had a prior disciplinary record.[67] Gorgia also testified that he was "not comfortable" with Bloomfield's penny stock business and that he had concerns about that business. Despite those concerns and what he knew about Bloomfield's background, Gorgia relied on Bloomfield's and Martin's unverified representations about customers and their penny stock transactions without contacting their former firm, Western, or making his own inquiries.[68] Furthermore, Gorgia never followed up on these or other red flags, as described below, by placing Bloomfield on heightened supervision.[69]

---

[66]   *William J. Murphy*, Exchange Act Rel. No. 69923, 2013 WL 3327752, at *18 (July 2, 2013) (quoting *John B. Busacca*, III, Exchange Act Rel. No. 63312, 2010 WL 5092726, at *10 (Nov. 12, 2010), aff'd, 449 F. App'x 886 (11th Cir. 2011)); *see also, e.g.*, *Quest Capital Strategies, Inc.*, Exchange Act Rel. No. 44935, 55 SEC 362, 2001 WL 1230619, at *5 (Oct. 15, 2001) (stating that "supervisors must act decisively to detect and prevent violations of the securities laws when an indication of irregularity is brought to their attention"); *James J. Pasztor*, Exchange Act Rel. No. 42008, 54 SEC 398, 1999 WL 820621, at *7 (Oct. 14, 1999) (finding that supervisor "should have recognized from many red flags" that representative "was effecting wash trades and matched orders" and "should have conducted an independent investigation to determine whether these trades, which [supervisor] recognized were a matter of concern, violated the federal securities laws"); *Michael E. Tennenbaum*, Exchange Act Rel. No. 18429, 47 SEC 703, 1982 WL 31984, at *6 (Jan. 19, 1982) (finding failure to supervise where, despite specific warnings of possible misconduct, supervisor "failed to take or recommend any action to investigate [the] activities").

[67]   In 1996, the National Futures Association fined Bloomfield $5,000 and barred him from acting as a principal and supervisor for three years, based on findings that he knowingly submitted false and misleading information to NFA and failed to supervise the commodity futures sales activity of an unregistered person. The NFA allowed him to act as manager of a one-person branch.

[68]   *See, e.g.*, *Stephen J. Horning*, Exchange Act Rel. No. 56886, 2007 WL 4236161, at *10 (Dec. 3, 2007) ("We have repeatedly stressed that supervisors cannot rely on the unverified representations of their subordinates. This is especially true where the subordinates have committed misconduct in the past."), aff'd, 570 F.3d 337 (D.C. Cir. 2009).

[69]   We have emphasized the "need for heightened supervision when a firm chooses to have associated with it a person who has known regulatory problems or customer complaints." *Robert J. Prager*, Exchange Act Rel. No. 51974, 58 SEC 634, 2005 WL 1584983, at *11 (July 6, 2005). Leeb's WSP manual gave Gorgia supervisory responsibility over individuals placed on heightened supervision.

18

During the first half of 2005, Pershing informed Gorgia that it wanted Leeb's registered representatives to complete and to submit low-priced security questionnaires, which were designed to assist the registered representatives in conducting their due diligence review. Gorgia understood and appreciated the importance of the questionnaires. He also knew from Pershing that Bloomfield and Martin were not completing and submitting questionnaires to Pershing. Notwithstanding his knowledge of these facts, Gorgia failed to give supervisory direction to Bloomfield and Martin to ensure the prompt and accurate submission of questionnaires and failed to review questionnaires received from the OSJ.

In September 2005, Pershing CCO Claire Santaniello personally met with Gorgia and Leeb president Miller in Leeb's New York office to discuss Pershing's continuing questions about the OSJ's customers' accounts and transactions. At the meeting, Pershing raised specific concerns about Bloomfield, including his disciplinary history before joining Leeb, the adequacy of his and Martin's due diligence inquiries into their customers' proposed penny stock sales, and the nature and extent of Leeb's supervision of Bloomfield. Santaniello testified that she hoped Leeb would understand and share Pershing's concerns and take reasonable action in response. But that did not occur. Gorgia, as Bloomfield's supervisor and as a senior manager involved in formulating Leeb's response to Pershing's concerns, had an obligation to take affirmative steps to follow up on those concerns.[70] Gorgia did not take any such steps. Through his inaction, he allowed the problems to fester.

In December 2005, Pershing took the unusual step of terminating its clearing arrangement with Leeb. Still, Gorgia did not question Bloomfield's and Martin's customers' penny stock trading, nor did he respond to Pershing's ongoing alerts about questionable activity in those customers' accounts during the transition from Pershing to Legent. After regulators began to question certain OSJ transactions, customers, and accounts, Gorgia wrote to Miller that he believed the OSJ was under a "microscope." In the face of regulatory scrutiny, Gorgia should have looked into the possibility of fraudulent or other illegal activity involving client accounts of those under his supervision. Instead, he did virtually nothing.[71]

---

[70]   *See Gutfreund*, 1992 WL 362753, at *16 (chief legal counsel could be deemed supervisor where he "share[d] in the responsibility to take appropriate action to respond to the misconduct").

[71]   We do not intend to suggest that any one or all of the measures set forth above is necessary to establish adequate supervision; rather, we are merely settings forth examples of the many possible corrective measures that Gorgia could have taken. Instead, Gorgia did virtually nothing. *Cf. James Thomas McCurdy, CPA*, Exchange Act Rel. No. 49182, 57 SEC 277, 2004 WL 210606, at *9 (Feb. 2, 2004) (finding that accountant's failure to undertake simple, obvious steps regarding collectibility of receivable amounted to highly unreasonable conduct within meaning of Rule of Practice 102(e)), *petition denied*, 396 F.3d 1258 (D.C. Cir. 2005).

19

Gorgia argues that he should not be held liable for any supervisory failures because Leeb president Miller thwarted his attempts to detect and prevent Bloomfield's and Martin's securities law violations. He does not substantiate this argument, and it is undermined by his testimony that he had "unfettered" authority to act as necessary.[72]

The record shows that, contrary to Gorgia's claims that he attempted to prevent Bloomfield's and Martin's misconduct, he failed to raise and document questionable activity to Pershing, Miller, the Board of Directors ("Board"), auditors, or regulators. Rather, he misled them through misstatements and omissions. For instance, in March 2005, Pershing closed six accounts at the OSJ. The closure of these accounts at a time when NASD had yet to approve Leeb's request to establish the OSJ was another red flag that should have prompted Gorgia to make inquiries. Instead, Gorgia wrote to Pershing that PIPE transactions were not part of Leeb's "normal" course of business, even though he knew that such transactions had become a large and lucrative part of its business. He also wrote to Pershing that Leeb's PIPE transactions were "in no way suspicious or in violation of any [f]ederal [l]aws," although he had no basis for making such a conclusion. And he never informed NASD about the closure of the OSJ accounts, even though NASD did not approve Leeb's application to establish the OSJ until August 2005.

In June 2005, Gorgia arranged for outside auditors to review AML procedures in the New York office. Gorgia worked with the auditors and had input into their report. Notwithstanding the warning signs that had been brought to Gorgia's attention up to that point, the report stated that Leeb had "not identified any unusual or suspicious activity or patterns of activity that required further inquiry." The report did not specifically address the firm's AML procedures or identify any deficiencies in those procedures.

Concerning Leeb's application to establish the OSJ, Gorgia declared to NASD that the firm's participation in PIPE transactions was "limited to relationships with existing individuals known to Leeb, cleared through FinCEN, sophisticated investors, and qualified accredited investors under the Rules and Regulations of NASD," based on nothing more than Bloomfield's unverified representations. He also told NASD that Leeb "demand[ed] the Private Place[ment] Memorandum, allocation authorizations, [and] low priced securities questionnaires for each and every deal," knowing that these statements were untrue.

Gorgia further promised to NASD that audits of the OSJ would be conducted "at least quarterly," and that Bloomfield would be "dismissed" if the audits revealed "any major violations or numerous minor violations." Gorgia conducted the first of the promised audits in August 2005, but the OSJ files were so disorganized that he left without completing the audit. Ignoring this red flag, he did not seek to determine whether Bloomfield was adequately supervising OSJ customer

---

[72]   Gorgia further argues that the Division took a biased approach in this proceeding by lumping him with the other respondents. Gorgia does not explain his theory of how being one of multiple respondents in a proceeding is evidence of bias and, in any event, due process does not require a neutral prosecutor. *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248-50 (1980).

20

accounts, or whether Bloomfield and Martin were conducting a reasonable inquiry into the facts surrounding their customers' proposed penny stock sales. After the visit, he did not report his observations or express his concerns to others. Rather, that month, he wrote a report to Leeb's Board stating that the firm's compliance exposure had been "reduced" due to "increased interaction" with the clearing firm, without disclosing that the "increased interaction" consisted of increased complaints from Pershing about possible illegal activity being conducted through customer accounts.

In February 2006, an NASD examination noted Leeb's apparent violations of NASD rules, including the failure to establish or enforce adequate supervisory procedures in such areas as supervision of the OSJ and review of electronic communications, but did not discuss penny stock transactions. Gorgia responded to the examiner that "significant management changes" had occurred at Leeb during 2005 that made the firm "more responsive to, and better able to monitor, all aspects of firm Compliance." The record does not support his claim.

In March 2006, Gorgia submitted to Miller an annual report that discussed significant business developments. The report stated that Leeb had established a "new clearing arrangement" that would help the firm to "isolate" and to "rigorously review" its penny stock business. But the report did not state that the new arrangement had been necessitated by Pershing terminating its clearing agreement with Leeb. The report also falsely stated that customers had stopped engaging in PIPE transactions.

In May 2006, Gorgia received an inquiry from Commission staff seeking information about Thimble's wire activity and the origin of 390,000 shares of GAPJ stock. The month before, the Commission had suspended trading in GAPJ stock for nearly three weeks due to questions about the company's legitimacy. Gorgia forwarded the inquiry to Bloomfield for his input, then responded to the staff that the 390,000 GAPJ shares "were received [via] DTCC [Depository Trust & Clearing Corporation] and we have no indication of the originating party. We did not receive [stock] certificates." He did nothing more, even though the trading suspension was a red flag of possible misconduct that demanded further inquiry.

In June 2006, Gorgia arranged for a second review of Leeb's AML program by the same auditing firm that performed the 2005 audit. He again gave input to and cooperated with the auditors. The auditors' report, which found "no material deficiencies," stated that AML review and securities-related processing for the New York office and OSJ were done in the New York office when, in fact, there were no AML reviews of the OSJ. The report also described reviews of customer accounts by compliance that never took place. By this time, Gorgia knew that AML procedures in the OSJ were inadequate, but he did not disclose what he knew to the auditors or others and did not take corrective action. When asked why he failed to report any of the serious problems at Leeb, Gorgia testified that he was not a "whistleblower" and would not "chop the legs off of [his] employer."

21

### C.   Gorgia did not qualify for Exchange Act Section 15(b)(4)(E)'s "safe harbor."

Exchange Act Section 15(b)(4)(E) contains a "safe harbor" provision that protects supervisors from liability if the broker-dealer has "(i) . . . established procedures, and a system for applying such procedures, which would reasonably be expected to prevent and detect, insofar as practicable, any violation by such other person, and (ii) such person has reasonably discharged the duties and obligations incumbent upon him by reason of such procedures and system without reasonable cause to believe that such procedures and system were not being complied with."[73]

The "safe harbor" provision of Exchange Act Section 15(b)(4)(E) is unavailable to Gorgia because, as discussed above, Leeb did not have procedures in place or a system for applying them that would reasonably be expected to detect and deter violations of the Securities Act's registration requirements. Leeb's procedures failed to "set[] forth reasonable inquiry procedures for registered representatives to follow when customers sought to sell large amounts of an unknown stock to the public without registration."[74] Its procedures failed to identify "specific risk factors alerting registered representatives to the possibility that a proposed transaction might be part of an unlawful distribution--such as the classic warnings signs of an obscure issuer, a thinly traded security, and the deposit of stock certificates in a large volume of shares."[75] Its procedures also failed to instruct registered representatives on how to determine whether a proposed sale was exempt from registration, "including asking a customer how, when, and under what circumstances the customer acquired the stock."[76] And its procedures failed further to provide supervisors with a "reliable mechanism for identifying securities sales that should be investigated or halted" for violating the securities laws.[77]

Moreover, Leeb never revised its procedures to reflect the opening of the OSJ in August 2005. As a result, there were no procedures specifying how reviews of the OSJ would be conducted or when the quarterly audits (that Gorgia represented to NASD) would occur. Furthermore, Gorgia failed to discharge the duties and obligations imposed on him by Leeb's existing procedures, such as the review of wire transfers and Pershing's monthly reports noting red flags.

---

[73]   15 U.S.C. § 78o(b)(4)(E).

[74]   *Midas Sec.*, 2012 WL 169138, at *12 n.69.

[75]   *Id.*

[76]   *Id. &* n.70.

[77]   *Id.* & n.71.

22

For the foregoing reasons, we conclude that Gorgia failed reasonably to supervise Bloomfield and Martin with a view to detecting and preventing their securities law violations.[78] We also conclude that Gorgia did not qualify for Exchange Act Section 15(b)(4)(E)'s safe harbor.

## V.     Bloomfield, Martin, and Gorgia aided and abetted and were a cause of Leeb's reporting violations.

### A.     Broker-dealers must report certain suspicious transactions to the U.S. Treasury Department's Financial Crimes Enforcement Network.

Exchange Act Rule 17a-8, promulgated pursuant to Exchange Act Section 17(a), requires registered brokers and dealers to comply with the reporting, recordkeeping, and record retention requirements of chapter X of title 31 of the Code of Federal Regulations. That chapter provides that a broker-dealer must file a SAR with the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN") if a transaction "involves or aggregates funds or other assets of at least $5,000, and the broker-dealer knows, suspects, or has reason to suspect that the transaction (or a pattern of transactions of which the transaction is a part)"[79] (1) involves funds derived from illegal activity, or is intended or conducted to hide or disguise funds derived from illegal activity as part of a plan to violate or evade a federal law or regulation or avoid a transaction reporting requirement; (2) is designed to evade requirements of the Bank Secrecy Act ("BSA");[80] (3) has no business or apparent lawful purpose, and the broker-dealer knows of no reasonable explanation for the transaction after examining the available facts; or (4) involves use of the broker-dealer to facilitate criminal activity.[81]  The fourth prong requires reporting of "all criminal violations," subject to certain "explicit exceptions," and expressly covers "transactions being carried out for the

---

[78]     Because the evidence is sufficient to support a finding that Gorgia failed reasonably to supervise Bloomfield and Martin, we do not address the law judge's finding that Gorgia also failed to supervise Labi. *See supra* n.8.

[79]     "The language relating to patterns of transactions is intended to make explicit" that "if a broker-dealer determines that a series of transactions that would not independently trigger the suspicion of the broker-dealer, but that taken together, form a suspicious pattern of activity, the broker-dealer must file a suspicious transaction report." *Amendment to the Bank Secrecy Act Regulations—Requirement that Brokers or Dealers in Securities Report Suspicious Transactions*, 67 Fed. Reg. 44,048, 44,051 (July 1, 2002); *see also id.* & n.12 (recognizing that a "transaction may not always appear suspicious standing alone" and noting that "broker-dealers are experienced in reviewing patterns or series of transactions under the federal securities laws for the purpose of identifying securities law violations").

[80]     *See* 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-1959, & 31 U.S.C. §§ 5311-5330.

[81]     31 C.F.R. § 1023.320.

23

purpose of conducting illegal activities, whether or not funded from illegal activities."[82]  The failure to file a SAR is a violation of Exchange Act Section 17(a) and Exchange Act Rule 17a-8.[83]

### B.   Leeb violated Exchange Act Section 17(a) and Exchange Act Rule 17a-8 by failing to file SARs.

Leeb violated Exchange Act Section 17(a) and Exchange Act Rule 17a-8 by failing to file SARs in connection with suspicious transactions in each of the Uselton and Thimble accounts. As discussed above, Leeb customers repeatedly engaged in a pattern of penny stock transactions that Leeb knew, suspected, or had reason to suspect[84] violated registration requirements and involved the type of illegal conduct that should have caused Leeb to file SARs. The trading pattern in the Uselton and Thimble accounts exhibited indicia of possible market manipulation (*e.g.*, purchases and sales made in large blocks of obscure stocks at increasing prices where no issuer developments explained those price increases, thereby creating the illusion of demand for the stocks).[85] Moreover, the Useltons' prior disciplinary records, their control of multiple entity accounts, and Thimble's wire transfers of funds to an international tax haven met the criteria for suspicious activity set forth in Leeb's AML manual.[86]  Gorgia's knowledge of the many direct warnings and red flags of potential misconduct in both the Uselton and Thimble accounts is sufficient to establish that Leeb knew, suspected, or had reason to suspect that the transactions or pattern of transactions

---

[82]   *Amendment to the Bank Secrecy Act Regulations—Requirement that Brokers or Dealers in Securities Report Suspicious Transactions*, 67 Fed. Reg. at 44,051.

[83]   *See* 15 U.S.C. § 78q(a); 17 C.F.R. § 240.17a-8.

[84]   As discussed in greater detail below, Bloomfield, Gorgia, and Martin, acting within the scope of their employment, each had knowledge of (or, at the very least, had ample reason to suspect) the suspicious activity in the accounts at issue. Under settled law, their knowledge is imputed to Leeb. *See, e.g.*, *Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 911 (9th Cir. 2008) ("Generally, the knowledge of a corporate officer within the scope of his employment is the knowledge of the corporation."); *United States v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st Cir. 1987) (stating that "the knowledge obtained by corporate employees acting within the scope of their employment is imputed to the corporation"). Indeed, Gorgia was a senior manager at Leeb, so his knowledge of the activity alone is sufficient to establish that Leeb knew, suspected, or had reason to suspect that the activity was suspicious.

[85]   *See, e.g.*, *Jay Michael Fertman*, Exchange Act Rel. No. 33479, 51 SEC 943, 1994 WL 17055, at *4 (Jan. 14, 1994) (describing such a trading pattern as characteristic of manipulative activity).

[86]   Bloomfield claimed that he had "no clue" Liechtenstein was a known tax haven. Leeb's AML manual gave Bloomfield, as a "designated principal," responsibility for consulting outside sources that identified countries as being tax havens or presenting money laundering risks. At the time, outside sources, such as the Organization for Economic Cooperation and Development, identified Liechtenstein as a tax haven.

24

in those accounts required reporting.[87]  For example, Gorgia emailed Bloomfield and Martin telling them to "stop the nonsense of transferring stock between foreign unrelated accounts." All of these factors should have prompted Leeb's filing of SARs.[88]  Its failure to do so violated Exchange Act Section 17(a) and Exchange Act Rule 17a-8.[89]

### C.    Bloomfield, Martin, and Gorgia aided and abetted Leeb's SARs violations.

To establish Bloomfield's, Martin's, and Gorgia's aiding and abetting liability, we must find that they substantially assisted Leeb's primary violations of Exchange Act Section 17(a) and Exchange Act Rule 17a-8 and that they provided such assistance with the requisite scienter.[90]  "The scienter requirement for aiding-and-abetting liability in administrative proceedings may be satisfied by evidence that the respondent knew of, or recklessly disregarded, the wrongdoing and his or her role in furthering it."[91]  One who aids and abets a primary violation is necessarily a "cause" of the violation.[92]

---

[87]    *SEC v. Tambone*, 550 F.3d 106, 147 (1st Cir. 2008) (finding that broker-dealer acted "with the requisite level of scienter, ascertained through the mental state of its management"), *reh'g en banc granted and opinion withdrawn*, 573 F.3d 54 (1st Cir. 2009), *opinion reinstated in relevant part*, 597 F.3d 436 (1st Cir. 2010). Bloomfield's and Martin's knowledge of the suspicious activity in the Uselton and Thimble accounts could also establish that Leeb knew, suspected, or had reason to suspect it needed to file SARs. *See*, *e.g.*, *United States v. Ladish Malting Co.*, 135 F.3d 484, 492 (7th Cir. 1998) ("Corporations 'know' what their employees who are responsible for an aspect of the business know.").

[88]    Indeed, the activity in the accounts was so suspicious that it raised serious concerns at Leeb's clearing brokers.

[89]    Bloomfield and Martin contend that they cannot be held liable for aiding and abetting Leeb's primary violations because Leeb was not a party to this proceeding. We previously have rejected the argument that the Commission may not proceed against an aider and abettor unless the primary violator is charged. *See Swartwood*, *Hesse*, *Inc.*, Exchange Act Rel. No. 31212, 50 SEC 1301, 1992 WL 252184, at *3 n.8 (Sept. 22, 1992) (citing *United States v. Mann*, 811 F.2d 495, 497 (9th Cir. 1987)).

[90]    *See SEC v. Apuzzo*, 689 F.3d 204, 206, 211 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2855 (2013); *vFinance Invs.*, *Inc.*, Exchange Act Rel. No. 62448, 2010 WL 2674858 (July 2, 2010) (finding that officer of broker-dealer willfully aided and abetted broker-dealer's books and records violations); *Prager*, 2005 WL 1584983, at *6 & n.17 (stating elements necessary for aiding and abetting liability and citing D.C. Circuit cases).

[91]    *Eric J. Brown*, Exchange Act Rel. No. 66469, 2012 WL 625874, at *11 n.23 (Feb. 27, 2012), *reconsideration denied,* Exchange Act Rel. No. 66752, 2012 WL 1143573 (Apr. 5, 2012), *petition denied*, *SEC v. Collins*, 736 F.3d 521 (D.C. Cir. 2013).

[92]    *Sharon M. Graham*, Exchange Act Rel. No. 40727, 53 SEC 1072, 1998 WL 823072, at *7 n.35 (Nov. 30, 1998), *aff'd*, 222 F.3d 994 (D.C. Cir. 2000).

25

Leeb's AML manual charged all employees with responsibility for AML compliance, including identifying red flags that would indicate the need for Leeb to file a SAR. Leeb's AML manual set forth examples of such red flags, including: a customer's or associate's history of criminal, civil, or regulatory violations; multiple limited liability companies with the same address; multiple transfers of funds or wire transfers to and from tax havens and countries considered to present money laundering risks; and penny stock activity. Leeb's AML manual required registered representatives like Martin to report suspicious activity to "designated principals," in this case, Bloomfield. Bloomfield, in turn, was required to report directly to the firm's AML Program Supervisor, Gorgia. Leeb's AML Manual named Gorgia, in his capacity as AML Program Supervisor, as the contact point for all Leeb employees and associated persons who have suspicions or concerns, and as the initial point of authority in determining whether or not certain unusual activities constitute reportable suspicious activities. In addition, Leeb's AML manual named Gorgia, in his capacity as CCO, as the central point of contact for communication with the regulatory agencies regarding money laundering issues and as the final point of authority in determining whether or not certain unusual activities constitute reportable suspicious activities. Thus, Gorgia was the designee for making decisions on behalf of Leeb about filing SARs, and he was well aware of many of the red flags necessitating the filing of SARs.

Bloomfield and Martin substantially assisted Leeb's violations by repeatedly disregarding red flags of suspicious activity in the Uselton and Thimble accounts and not reporting that activity to Leeb. Bloomfield and Martin understood that they were obligated to conduct due diligence and assist the firm in AML compliance. As the brokers who managed the daily activity in the Uselton and Thimble accounts, moreover, they were intimately familiar with the details of those accounts that triggered Leeb's obligation to file SARs. By October 2005, Bloomfield and Martin were aware of the pronounced pattern of suspicious activity in the Uselton accounts. An equally evident pattern of suspicious activity existed in the Thimble account, compounded by the wiring of sale proceeds from the Thimble account to Liechtenstein, a known tax haven.

In addition to knowing about this suspicious activity, Bloomfield and Martin knew that, in response to similar suspicious activity, Western had closed the Useltons' accounts at that firm in July 2004, and Pershing had closed the six OSJ accounts in March 2005. These closings were red flags in and of themselves that the type of trading activity in the accounts was suspicious and required reporting. Another obvious red flag was the Commission's trading suspension in GAPJ stock.

The red flags of suspicious activity were pervasive in the Uselton and Thimble accounts, yet Bloomfield and Martin claimed, incredibly, that they saw nothing suspicious in the accounts that would warrant the filing of SARs. We find that their failure to report the obvious to Leeb was intentional. We conclude that Bloomfield and Martin, by this conduct, intentionally (and certainly recklessly) provided substantial assistance to Leeb and thereby aided and abetted and were a cause of Leeb's Exchange Act Section 17(a) and Exchange Act Rule 17a-8 violations. We also conclude that Bloomfield's and Martin's aiding and abetting violations were willful.

26

The record shows that Gorgia substantially assisted Leeb's reporting violations through his knowing or reckless conduct. Gorgia knew of his responsibility to file SARs on Leeb's behalf. Moreover, as the firm's point of contact with Pershing and regulators, he knew or was reckless in not knowing about suspicious activity that was occurring in Leeb customer accounts. For instance, he knew about Pershing's March 2005 closing of six OSJ accounts, attended the September 2005 meeting with Pershing's CCO Santaniello, and knew about Pershing's December 2005 termination of its clearing agreement with Leeb. He also knew Bloomfield and Martin were "transferring stock between foreign unrelated accounts." Gorgia not only failed to file SARs once he obtained this knowledge, but he also took affirmative action to conceal suspicious activity from, or at least to prevent the detection of suspicious activity by, others, such as Miller and the Board, who could have initiated Leeb's filing of SARs.[93] We conclude that Gorgia willfully aided and abetted and was a cause of Leeb's violations of Exchange Act Section 17(a) and Exchange Act Rule 17a-8.

## VI.   Bloomfield's, Martin's, and Gorgia's conduct warrants significant sanctions.

### A.   Bars

Exchange Act Section 15(b) authorizes us to censure, place limitations on, suspend, or bar a person from associating with any broker or dealer or from participating in any penny stock offering if we find that the person has, among other things, willfully violated the federal securities laws, or failed reasonably to supervise, and that it is in the public interest to do so.[94] In determining what sanction is appropriate in the public interest, we are guided by the following factors the egregiousness of the respondents' conduct; the isolated or recurrent nature of the infraction; the degree of scienter involved; the respondents' recognition of the wrongful nature of their conduct; the sincerity of any assurances against future violations; and the likelihood that the respondents' occupations will present opportunities for future violations.[95] Our "inquiry into . . . the public interest is a flexible one, and no one factor is dispositive."[96]

Bloomfield's and Martin's registration and aiding and abetting violations were egregious because they were blatant, concerned multiple customers and stocks, involved a large part of Leeb's overall business, and were contrary to essential provisions of the federal securities laws and AML regulations. Their violations were recurrent, continuing from at least early 2005 until mid-2007, and involved a high degree of scienter. Bloomfield and Martin, both experienced securities professionals, intentionally ignored numerous and obvious red flags suggesting that their customers

---

[93]   *See supra* Section IV.B.

[94]   15 U.S.C. § 78o(b).

[95]   *Brown,* 2012 WL 625874, at *12 n.29 (citing *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 91 (1981)).

[96]   *David Henry Disraeli*, Exchange Act Rel. No. 57027, 2007 WL 4481515, at *15 & n.85 (Dec. 21, 2007), *petition denied*, 334 F. App'x 334 (D.C. Cir. 2009).

27

were engaging in unlawful distributions of penny stocks and other improper activity, and they intentionally failed to report that activity to Leeb.

Bloomfield and Martin have not recognized the wrongful nature of their conduct, nor have they offered assurances against future violations. It is highly likely that their occupations will present opportunities for future violations.[97]  These factors (and, with regard to Bloomfield, his prior disciplinary record)[98] lead us to conclude that orders permanently barring Bloomfield and Martin from associating with any broker or dealer and from participating in any penny stock offering are necessary to protect the public interest. Permanent bars will serve a remedial purpose by preventing Bloomfield and Martin from again placing investors at risk through their involvement in the unlawful distribution of unregistered securities and through their substantial assistance in aiding and abetting securities law violations. And the bars will serve as a deterrent to other registered representatives who might engage in similar misconduct.[99]

Gorgia was in a position to stop Bloomfield's and Martin's registration violations but his egregious and recurrent supervisory failures allowed those violations to continue undetected during his tenure at Leeb. He acted with a high degree of scienter.[100]  He intentionally or recklessly failed to respond to red flags of possible misconduct. He knowingly sought to minimize and, at times, mislead others about the existence and significance of the problems. He never filed SARs on Leeb's behalf, even though he knew or was reckless in not knowing of the suspicious circumstances that triggered Leeb's obligation to file SARs and his obligation to do so for Leeb. He has provided no

---

[97]   At the time of the hearing, Martin and Bloomfield were co-owners of equal minority interests in AIS Financial, Inc. In May 2009, the majority owner of AIS was indicted in a pump-and-dump stock scheme. Although that owner ceased working at AIS following his indictment, the firm was subjected to heightened scrutiny by FINRA. In March 2011, a FINRA hearing panel expelled AIS from membership, finding, among other things, that it failed to identify, investigate, and report suspicious penny stock activity. *See Dep't of Enf. v. AIS Fin.*, *Inc.*, Complaint No. 2008012169101, 2011 WL 2542100 (Hearing Panel Decision Mar. 3, 2011).

[98]   *See*, *e.g.*, *Consol. Inv. Servs.*, *Inc.*, Exchange Act Rel. No. 36687, 52 SEC 582, 1996 WL 20829, at *6 (Jan. 5, 1996) (considering prior disciplinary history in imposing sanctions). Bloomfield contends that the Commission should not consider his prior disciplinary history because it involved only a "minor" sanction. Even if we did not consider Bloomfield's disciplinary history, we would conclude that his misconduct here alone warranted the full sanctions imposed.

[99]   *See*, *e.g.*, *McCarthy v. SEC*, 406 F.3d 179, 190 (2d Cir. 2005) (noting that deterrent value is a relevant factor in deciding sanctions).

[100]   Although scienter is not an element of failure to supervise liability under the Exchange Act, it relates to the reasonableness of the supervision and may be considered when imposing sanctions. *See Clarence Z. Wurts*, Exchange Act Rel. No. 43842, 54 SEC 1121, 2001 WL 32844, at *8 (Jan. 16, 2001).

28

reliable assurances against future violations and continues to blame Leeb president Miller for his predicament.

We have stated that "failures to supervise are serious violations."[101] Supervisors are the first line of defense against wrongdoing by their subordinates. Gorgia not only abandoned his supervisory responsibilities, but, through his aiding and abetting of Leeb's reporting violations, he also enabled customers, including the Useltons, to perpetuate their suspicious activity without detection for a substantial period. We thus find that the balance of all factors weighs in favor of imposing a bar against Gorgia from association with any broker or dealer in any capacity with the right to reapply in a non-proprietary, non-supervisory capacity after two years. The severity of the sanction is warranted in the public interest to address the serious risk of harm to investors and the markets demonstrated by his failure to supervise.[102]

## B.    Cease-and-Desist Orders

Securities Act Section 8A and Exchange Act Section 21C authorize us to impose a cease-and-desist order on any person who is violating, has violated, or is about to violate any provision of those Acts and on any other person that is, was, or would be a cause of the violation, due to an act or omission the person knew or should have known would contribute to such a violation.[103]   In determining whether a cease-and-desist order is appropriate, we consider whether a reasonable likelihood of future violations exists, the seriousness of the violations, the isolated or recurrent nature of the violations, the respondents' state of mind in committing the violations, the respondents' recognition of the wrongful nature of their conduct, and the recency of the violations.[104]   Absent evidence to the contrary, a single past violation ordinarily suffices to establish a risk of future violations.[105]

Bloomfield's and Martin's registration violations constituted egregious misconduct. As we have stated, the registration requirements are the heart of the securities regulatory system, and disregarding those requirements justifies strong remedial measures.[106]   The registration violations

---

[101]   *Brown*, 2012 WL 1143573, at *2 (order denying motion for reconsideration of civil penalties).

[102]   *See, e.g.*, *Consol. Inv. Servs.*, 1996 WL 20829, at *6 (barring firm officers from association with a right to reapply after one year); *Albert Vincent O'Neal*, Exchange Act Rel. No. 34116, 1994 WL 234316, at *6 (May 26, 1994) (barring branch manager in all capacities, with a right to reapply in a non-proprietary, non-supervisory capacity after one year).

[103]   15 U.S.C. §§ 77h-1, 78u-3.

[104]   *KPMG Peat Marwick LLP*, Exchange Act Rel. No. 43862, 54 SEC 1135, 2001 WL 47245, at *23 (Jan. 19, 2001), *petition denied*, 289 F.3d 109 (D.C. Cir. 2002).

[105]   *Id.* at *24.

[106]   *Kirby*, 2003 WL 71681, at *11.

29

occurred repeatedly and over an extended period of time. Notwithstanding our decision to permanently bar them from associating with any broker-dealer and from participating in any penny stock offering, Bloomfield and Martin may become otherwise active in the financial markets at any time. Cease-and-desist orders will serve the remedial purpose of encouraging them to take their duties and the registration requirements more seriously in the future. Given the seriousness of their registration violations and apparent failure to appreciate their responsibilities as securities professionals, we find that the record presents sufficient risk that Bloomfield and Martin will commit future violations to warrant the imposition of orders requiring them to cease and desist from committing or causing violations or future violations of Securities Act Sections 5(a) and 5(c).

We also find it appropriate to impose cease-and-desist orders on Bloomfield, Martin, and Gorgia from committing or causing violations or future violations of Exchange Act Section 17(a) and Exchange Act Rule 17a-8.[107] Given their repeated disregard of red flags of suspicious activity that should have led Leeb to file SARs, we find that the record presents sufficient risk of future violations to warrant such relief.

### C.    Disgorgement

Securities Act Section 8A(e) and Exchange Act Sections 21B(e) and 21C(e) authorize disgorgement, including reasonable prejudgment interest, in a cease-and-desist proceeding and a proceeding in which a civil money penalty may be imposed.[108] Disgorgement is an equitable remedy designed to deprive wrongdoers of their unjust enrichment and deter others from similar misconduct.[109] Accordingly, "[t]he amount of disgorgement should include all gains flowing from the illegal activities," but calculating disgorgement "requires only a reasonable approximation of profits causally connected to the violation."[110] Once the Division shows that its disgorgement figure is a reasonable approximation of the amount of unjust enrichment, the burden shifts to the respondents to demonstrate that the Division's estimate is not a reasonable approximation.[111] Where disgorgement cannot be exact, the "well-established principle" is that the burden of

---

[107]  *See, e.g.*, *vFinance Invs., Inc.*, 2010 WL 2674858, at *17 (ordering respondents to cease and desist from committing or causing any violations or future violations of the books and records provisions).

[108]  15 U.S.C. §§ 77h-1(e), 78u-2(e), 78u-3(e). On July 11, 2012, we ordered additional briefing so that the parties (with the exception of Gorgia) could clarify their positions on disgorgement. *See Ronald S. Bloomfield*, Exchange Act Rel. No. 67397, 2012 WL 2836799 (July 11, 2012).

[109]  *See, e.g.*, *Platforms Wireless Int'l Corp.*, 617 F.3d at 1096 (quoting *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998) ("Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable.")).

[110]  *Id.* (quoting *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1114 (9th Cir. 2006) and *First Pacific Bancorp*, 142 F.3d at 1192 n.6).

[111]  *Id.* (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989)).

30

uncertainty in calculating ill-gotten gains falls on the wrongdoer whose illegal conduct created that uncertainty.[112]

Bloomfield and Martin do not dispute that there was a total of $134,090 in gross commissions in connection with the Securities Act Section 5 violations. Instead, the parties disagree as to the formula for calculating Bloomfield's and Martin's share of commissions. Bloomfield and Martin contend that the breakdown of commissions was 55% for Martin, 5% for Bloomfield, and the remainder to Leeb. But their contention is inconsistent with the evidence, namely, a letter with supporting documentation from Bloomfield's and Martin's counsel and the testimony of a Commission staff examiner, that the percentage breakdown of commissions was 62% for Martin, 17.5% for Bloomfield (including a 12.5% "override" that Martin paid to Bloomfield), and the remainder to Leeb. Indeed, Bloomfield's own testimony, though vague, confirms that he received the 12.5% override of commissions in addition to his 5% commission. Bloomfield and Martin do not address the "override" in their pleadings, nor do they produce any documentary evidence challenging the Division's percentage breakdown. All doubts concerning the amount of commissions to be disgorged must be resolved against the wrongdoers.[113]

Applying the Division's percentages, 17.5% for Bloomfield and 62% for Martin, to the $134,090, Bloomfield and Martin realized profits of $23,465.75 and $83,135.80, respectively, as a result of their violations of Securities Act Section 5. Requiring Bloomfield and Martin to disgorge these amounts will prevent them from profiting from their illegal activities[114] and deter others from violating the federal securities laws.[115] "The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable."[116] We therefore order Bloomfield and Martin to disgorge $23,465.75 and $83,135.80, respectively, in ill-gotten commissions, plus prejudgment interest calculated pursuant to Section 6621(a)(2) of the Internal Revenue Code[117] and compounded quarterly.[118]

---

[112]    *Id.* (quoting *First City Fin. Corp.*, 890 F.3d at 1232).

[113]    *SEC v. First City Fin. Corp.,* 688 F. Supp. 705, 727 (D.D.C. 1988), *aff'd*, 890 F.2d 1215 (D.C. Cir. 1989).

[114]    *Rodney R. Schoemann,* Securities Act Rel. No. 9076, 2009 WL 3413043, at *13 (Oct. 23, 2009), *aff'd*, 398 F. App'x 603 (D.C. Cir. 2010).

[115]    *See, e.g., J.T. Wallenbrock & Assocs.*, 440 F.3d at 1113.

[116]    *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996) (quoting *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972)).

[117]    26 U.S.C. § 6621(a)(2); *see Platforms Wireless Int'l Corp.,* 617 F.3d at 1099 (holding that district court did not abuse its discretion in calculating prejudgment interest based on tax underpayment rate provided in 26 U.S.C. § 6621; stating that Commission adopted this rate for prejudgment interest on disgorgement orders in administrative proceedings and its reasoning on issue was persuasive).

[118]    Rule of Practice 600(b), 17 C.F.R. § 201.600(b). "[E]xcept in the most unique and

(continued…)

31

The Division also requests that we order Bloomfield and Martin to disgorge the commissions they earned from all securities transactions in the seven accounts at issue, *i.e.*, the six Uselton-controlled accounts and one Thimble account, during the period from October 1, 2005 to June 1, 2007, when they were aiding and abetting and causing Leeb's violations of Exchange Act Section 17(a) and Exchange Act Rule 17a-8. The Division points to multiple and obvious red flags of possible manipulative activity and money laundering in the seven accounts and argues that Bloomfield's and Martin's intentional disregard of those red flags and failure to report them to Leeb enabled those accounts to stay open and allowed them to receive the commissions. Bloomfield and Martin, on the other hand, argue that the only commissions the Division can seek to disgorge are those for the sales of the nine securities that were the basis of the Securities Act Section 5 violations. On the facts of this case, we exercise our discretion not to impose any additional disgorgement beyond the commissions earned in connection with the Securities Act Section 5 violations.

### D.    Civil Money Penalties

Securities Act Section 20(d) and Exchange Act Section 21B authorize us to impose a civil penalty where a respondent has, among other misconduct, willfully violated or aided and abetted the violation of any provision of the federal securities laws or failed reasonably to supervise another person who has committed such violations.[119] In assessing the civil penalty required in the public interest, we consider whether the violations involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; the harm caused to others; the extent to which any person was unjustly enriched; prior violations; the need for deterrence; and such other matters as justice may require.[120]

Securities Act Section 20(d) and Exchange Act Section 21B specify a three-tier system identifying the maximum amount of a penalty. Bloomfield's and Martin's misconduct occurred between early 2005 and mid-2007. The adjusted maximum amount of a penalty in the first tier is $6,500; in the second tier, $65,000; in the third tier, $130,000 for each "act or omission" committed by a person during this time period.[121] For a second-tier penalty, the act or omission must have "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory

---

(...continued)

compelling circumstances, prejudgment interest should be awarded on disgorgement, among other things, in order to deny a wrongdoer the equivalent of an interest free loan from the wrongdoer's victims." *Terence Michael Coxon,* Exchange Act Rel. No. 48385, 56 SEC 934, 2003 WL 21991359, at *14 (Aug. 21, 2003), *aff'd*, 137 F. App'x 975 (9th Cir. 2005).

[119]  15 U.S.C. §§ 77t(d),78u-2.

[120]  *See id.* §§ 77t(d),78u-2.

[121]  *See* 17 C.F.R. § 201.1003 (setting forth maximum penalty amounts for violations occurring from February 15, 2005 to March 3, 2009).

requirement."[122]  A third-tier penalty not only must meet the requirements for a second-tier penalty, but the act or omission also must have "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons or resulted in substantial pecuniary gain to the person who committed the act or omission."[123]

We find second-tier penalties appropriate for Bloomfield's and Martin's violations of Securities Act Section 5, Exchange Act Section 17(a), and Exchange Act Rule 17a-8. In committing the Section 5 violations, Bloomfield and Martin acted in deliberate or reckless disregard of the applicable regulatory requirements over an extended period of time. Both Bloomfield and Martin participated in unlawful distributions of securities, executing trades that effectuated the unregistered sales of stock into the market. Ignoring the Useltons' disciplinary history, the warnings Bloomfield received from Leeb's clearing firms, and other obvious red flags suggesting that the sales were unlawful, Bloomfield and Martin conducted a patently insufficient inquiry into their customers' sales. Their brazen disregard of the registration requirements—the heart of the securities regulatory system—calls for significant penalties.

Second-tier penalties also are appropriate for Bloomfield's and Martin's aiding and abetting of Leeb's failure to file SARs. SARs provide "important and valuable" data to the law enforcement community.[124]  The Commission's "proactive review of SARs has resulted in a number of new investigations" in areas such as "insider trading, offering frauds, market manipulation, [and] embezzlement of client funds."[125]  Indeed, "[e]ven when a case is not initiated from a SAR, the existence of such a report can provide invaluable leads to investigators."[126]

Here, as discussed above, Bloomfield and Martin substantially assisted Leeb's failure to file SARs in connection with transactions in the Uselton and Thimble accounts. They did so notwithstanding multiple warnings about possible illegal activity in those accounts. Tellingly, these warnings came from Leeb's clearing firms—entities that, despite being further removed from the activity than Bloomfield and Martin, were able to perceive that the activity in those accounts was suspicious.[127]  Yet, despite these warnings and other obvious red flags, Bloomfield

---

[122]  15 U.S.C. §§ 77t(d), 78u-2.

[123]  *See id.* §§ 77t(d), 78u-2.

[124]  Financial Crimes Enforcement Network, *The SAR Activity Review* 1 (May 2009) ("SAR Activity Review") (available at http://www.fincen.gov/news_room/rp/files/sar_tti_15.pdf).

[125]  *Id.* at 18; *see also id.* at 26-37 (providing examples where SARs have been used in or triggered investigations).

[126]  *Id.* at 26.

[127]  Bloomfield and Martin also had frequent discussions with Western's CCO about suspicious activity in the Uselton accounts.

33

and Martin did nothing to ensure that this suspicious activity be reported to FinCEN, depriving law enforcement of valuable information. Instead, they turned a blind eye to this suspicious activity. In addition, Bloomfield and Martin facilitated the wiring of more than $40 million dollars from the Thimble account to a bank in Liechtenstein. And it is especially troubling that these flagrant violations involved penny stocks, which are recognized as presenting special risk of market manipulation, insider trading, and other illegal conduct.[128]  Bloomfield and Martin thus acted in deliberate or reckless disregard of the requirement that Leeb file SARs.

Given the gravity of the violations, we conclude that significant penalties are necessary to deter other violators. We have determined that a maximum second-tier penalty of $65,000 for each of the nine securities underlying Bloomfield's and Martin's primary violations of Securities Act Section 5 is appropriate.[129]  We further have determined that one maximum second-tier penalty of $65,000 for Bloomfield's and Martin's conduct in aiding and abetting Leeb's violations of its obligation to file SARs is appropriate.[130]   This total penalty of $650,000 each against Bloomfield and Martin will serve the public interest and the need for deterrence.[131]

We find that Gorgia's violations also warrant a second-tier penalty.[132]  As described above, his violations involved deliberate or reckless disregard of regulatory requirements and his supervisory duties. Unlike Bloomfield and Martin, however, Gorgia, who has no disciplinary history, did not himself violate Securities Act Section 5. Nonetheless, he failed reasonably to

[128]   *See, e.g.*, The Financial Action Task Force, *Money Laundering and Terrorist Financing in the Securities Sector* 20 (Oct. 2009) (available at http://www.fatf-gafi.org/media/fatf/documents/reports/ML%20and%20TF%20in%20the%20Securities%20Sector.pdf); SAR Activity Review at 24.

[129]   Each of the numerous unregistered sales of these nine securities could be considered a separate violation of Securities Act Section 5. *Carley*, 2008 WL 268598, at *26 n.157. Nevertheless, we believe that on the facts and circumstances of this case a single second-tier penalty for each of the nine securities at issue is appropriate. *See id.*

[130]   As with the penalty for the registration violations, each individual failure to file an SAR, or each account in which a failure to file a SAR occurred, could be considered a separate violation deserving of a separate penalty. *See supra* note 125. Again, we believe that on the facts and circumstances of this case a single second-tier penalty for failure to file SARs is appropriate.

[131]   *See* Securities Law Enforcement Remedies Act of 1990, H.R. Rep. No. 101-616 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1379, 1384 (stating that civil penalties "provide a financial disincentive to violations that reflect an unwillingness to incur the cost of full compliance with the securities laws, as opposed to engaging in affirmative conduct to defraud investors").

[132]   During the pendency of this appeal, we issued an order granting a partial protective order with respect to Gorgia's financial information. *Ronald S. Bloomfield,* Exchange Act Rel. No. 65571, 2011 WL 4889098 (Oct. 14, 2011).

34

supervise employees who committed such violations. We find a second-tier penalty of $30,000 for each of the nine securities underlying the Section 5 violations that he failed to supervise to be appropriate. With respect to Gorgia's aiding and abetting and causing Leeb's failure to file SARs, we find, as with Bloomfield and Martin, that one maximum second-tier penalty of $65,000 is appropriate. Gorgia was a senior manager with the responsibility to file SARs on Leeb's behalf, and he himself received multiple warnings of suspicious activity in Leeb's customer accounts through his role as a supervisor and as Leeb's contact person with its clearing firms and regulators. This total penalty of $335,000 will serve the public interest and the need for deterrence.[133]

Although these penalties exceed the amount of disgorgement ordered here, Bloomfield's, Martin's, and Gorgia's egregious misconduct justifies substantial penalties. The statutory authorization to impose civil penalties specifically provides for second-tier penalties without regard to defendants' pecuniary gain.[134]  Thus, such penalties are not limited to the amount of profits derived from the violation.[135]  We conclude that the facts and circumstances of this case demonstrate that limiting civil penalties to the amount of disgorgement would be inappropriate.[136] And imposing penalties in an amount greater than disgorgement in response to egregious misconduct is consistent with our precedent.[137]

---

[133]  Gorgia also claims that he is financially unable to pay a civil penalty. Under Exchange Act Section 21B(c), the ability to pay may be considered, but it is only one discretionary factor, and may be disregarded where, as here, the conduct is egregious. *See, e.g., Gregory O. Trautman*, Exchange Act Rel. No. 61167A, 2009 WL 6761741, at *24 (Dec. 15, 2009). In any event, Gorgia has not substantiated his claim that he is unable to pay.

[134]  15 U.S.C. §§ 77t(d),78u-2.

[135]  *Cf. CFTC v. Angus Jackson, Inc.*, 2013 WL 320185, at *15 (S.D. Fla. Jan. 28, 2013) (so stating with respect to penalties in CFTC cases) (citing *CFTC v. Levy*, 541 F.3d 1102, 1112 (11th Cir. 2008) (rejecting defendant's argument that $600,000 civil penalty was excessive because he received only $20,000 from the violations where statute authorized a $120,000 penalty for "each violation," and a penalty in the amount of the profits would "utterly fail[] to account for the brazen, repeated, and intention nature of" the defendant's violations)).

[136]  *See, e.g., SEC v. Todt*, No. 98 Civ. 3980, 2000 WL 223836, at *13 (S.D.N.Y. Feb. 25, 2000) (imposing a second-tier "$200,000 civil penalty, or $50,000 for each of the four attempted sales" that violated the securities law, despite the absence of any pecuniary gain, given the "audacity of the fraud"), *aff'd*, 7 F. App'x 98 (2d Cir. 2001).

[137]  *See, e.g., Kirby*, 2003 WL 71681, at *1, *11 (imposing $300,000 civil penalty on respondent who was ordered to disgorge approximately $14,000 in commissions on transactions that violated Section 5 and $200,000 civil penalty on respondent who was ordered to disgorge approximately $30,000 in such commissions).

35

An appropriate order will issue.[138]

By the Commission (Chair WHITE and Commissioners GALLAGHER, STEIN, and PIWOWAR); Commissioner AGUILAR not participating.

Elizabeth M. Murphy
Secretary

---

[138] We have considered all of the parties' contentions. We have rejected or sustained them to the extent that they are inconsistent or in accord with the views expressed in this opinion. During the pendency of this appeal, on September 17, 2012, Gorgia filed a letter with the Commission requesting that it sever his case from that of the other respondents and issue a decision as to him. Gorgia's request is denied.

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Rel. No. 9553 / February 27, 2014

SECURITIES EXCHANGE ACT OF 1934
Rel. No. 71632 / February 27, 2014

Admin. Proc. File No. 3-13871

---

In the Matter of

RONALD S. BLOOMFIELD,
ROBERT GORGIA, and
JOHN EARL MARTIN, SR.

---

ORDER IMPOSING REMEDIAL SANCTIONS

On the basis of the Commission's opinion issued this day, it is

ORDERED that Ronald S. Bloomfield and John Earl Martin, Sr., be, and they hereby are, barred from association with any broker or dealer and from participation in any penny stock offering; and it is further

ORDERED that Robert Gorgia be, and he hereby is, barred from association with any broker or dealer; provided, however, that he may apply to become so associated in a non-proprietary, non-supervisory capacity after two years; and it is further

ORDERED that Ronald S. Bloomfield and John Earl Martin, Sr. cease and desist from committing or causing any violations or future violations of Sections 5(a) and 5(c) of the Securities Act of 1933, and Section 17(a) of the Securities Exchange Act of 1934 and Exchange Act Rule 17a-8; and it is further

ORDERED that Robert Gorgia cease and desist from committing or causing any violations or future violations of Section 17(a) of the Securities Exchange Act of 1934 and Exchange Act Rule 17a-8; and it is further

2

ORDERED that Ronald S. Bloomfield disgorge $23,465.75, plus prejudgment interest of $7,377.19, such prejudgment interest calculated beginning from June 1, 2007, in accordance with Commission Rule of Practice 600; and it is further

ORDERED that John Earl Martin, Sr., disgorge $83,135.80, plus prejudgment interest of $26,136.19, such prejudgment interest calculated beginning from June 1, 2007, in accordance with Commission Rule of Practice 600; and it is further

ORDERED that Ronald S. Bloomfield and John Earl Martin, Sr. each pay a civil money penalty in the amount of $650,000; and it is further

ORDERED that Robert Gorgia pay a civil money penalty in the amount of $335,000.

Payment of the amounts to be disgorged and the civil money penalties shall be: (i) made by U.S. postal money order, certified check, bank cashier's check (ii) made payable to the Securities and Exchange Commission; (iii) mailed or delivered by hand to the Enterprises Services Center, Accounts Receivable Branch, HQ Bldg., Room 181, AMZ-341, 6500 South MacArthur Bld., Oklahoma City, OK 73169; and (iv) submitted under cover letter that identifies the respondent and the file number of this proceeding. A copy of the cover letter and check shall be sent to David Stoelting and Adam Grace, Division of Enforcement, Securities and Exchange Commission, 3 World Financial Center, New York, NY 10281-1022.

By the Commission.


Elizabeth M. Murphy
Secretary